1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

RYAN GALLOWAY, et al.,

CASE NO. C09-1479JLR

11

Plaintiffs,

ORDER DENYING MOTION

12

v.

FOR SUMMARY JUDGMENT
AND GRANTING MOTION TO
SUPPLEMENT

13

LINCOLN NATIONAL LIFE
INSURANCE CO.,

14

15

Defendant.

## I.   INTRODUCTION

16

17

18

19

20

21

22

This matter comes before the court on Plaintiffs Ryan Galloway and Janice M.

Belceto's ("the Estate") motion for summary judgment that the Employee Retirement

Income Security Act ("ERISA") does not apply (Dkt. # 19), and motion to supplement

the administrative record (Dkt. # 17).  Having reviewed the motions, as well as all papers

filed in support and opposition, and deeming oral argument unnecessary, the court

1  DENIES the motion for summary judgment (Dkt. # 19), and GRANTS the motion to

2  supplement (Dkt. # 17).

3  **II.   BACKGROUND**

4  From 2000 to 2008, Kenneth Galloway ("Mr. Galloway") worked as a machinist

5  for Turbine Engine Components Technologies Corporation ("TECT").  (True Decl.

6  (Administrative Record ("Admin. Rec.")) at 197.)  On January 1, 2002, Defendant

7  Lincoln National Life Insurance Co. ("Lincoln National") issued a group life insurance

8  policy ("Voluntary Policy") to TECT.  (*Id.* at 11.)  Because it was a voluntary life

9  insurance policy, employees of TECT who elected coverage were required to pay the

10  entire cost of the premiums.  (*See* Blackburn Decl. (Dkt. # 25) Ex. 1 (Summary Plan

11  Description ("SPD")) at 23.)

12  On October 14, 2004, Mr. Galloway, a TECT employee at the time, enrolled in the

13  Voluntary Policy, electing coverage of $100,000.  (Admin. Rec. at 174.)  The Voluntary

14  Policy contains a provision ensuring continued coverage, without payment of premiums,

15  if a participant becomes totally disabled.  The Extension of Death Benefits section of the

16  Voluntary Policy provides, in relevant part:

17  Any Personal Life Insurance on your life will be continued, without
payment of premiums; if while you are insured:

18

19  (1) you become Totally Disabled before you reach age 60; and

20  (2) you submit proof of your disability which is received by the
Company:

21  (a) within 12 months after your Total Disability begins; or

22  (b) as soon as reasonably possible after that.

1

2
  Upon receipt of such proof, the Company will refund all premiums paid for
  your coverage from the date Total Disability began.

3  (*Id.* at 20.)  Under the Voluntary Policy, total disability "(1) means you are unable, due to

4  sickness or injury, to perform the material and substantial duties of any employment or

5  occupation for which you are or become qualified by reason of education, training, or

6  experience; and (2) must continue for at least 180 days."  (*Id.*)

7  In January 2008, Mr. Galloway stopped working at TECT due to achilles

8  tendonitis.  (*See id.* at 169.)  Seven months later, in July 2008, Mr. Galloway requested

9  that Lincoln National grant him waiver from paying premiums on the Voluntary Policy

10 due to total disability from achilles tendonitis.  (Mot. at 2.)  That August, Mr. Galloway

11 failed to pay the Voluntary Policy premium.  (Am. Compl.[1] (Dkt. #23) ¶ V.)  On August

12 27, 2008, Lincoln National denied Mr. Galloway's waiver request, determining—based

13 on the results of a "vocational assessment" undertaken by Lincoln National—that Mr.

14 Galloway was not totally disabled as that term is defined in the Voluntary Policy.

15 (Admin. Rec. at 169-70.)  Soon after, Mr. Galloway died.  (*Id.* at 166-67.)

16 Pursuant to Lincoln National's review procedures (*see id.* at 32-33), the Estate

17 appealed the denial of waiver decision (*id.* at 164) and requested payment of the

18 $100,000 death benefit under the Voluntary Policy (Mot. at 2.)  In a letter dated January

19

20

_____

21
   [1] The original complaint was amended to include the named beneficiary of the Voluntary
22 Policy, Janice M. Belceto.  (*See* Mot. to Am. Compl. (Dkt. # 16).)  Otherwise, the amended
   complaint is the same as the original.

ORDER- 3

12, 2009, Lincoln National upheld its denial of waiver decision and denied payment of death benefits under the Voluntary Policy. (Admin. Rec. at 107.)

The Estate then filed a second appeal. (*Id.* at 88.) In a letter dated April 29, 2009, Lincoln National again denied payment of death benefits and notified the Estate that it had exhausted all rights to appeal. (*Id.* at 80-81.)

On September 10, 2009, the Estate brought suit against Lincoln National in Snohomish County Superior Court, claiming that Mr. Galloway's death benefits under the Voluntary Policy were unreasonably denied under RCW 48.30.015(1). (Am. Compl. ¶ VII.) In addition to payment of the $100,000 under the Voluntary Policy, the Galloway Estate requested an additional $300,000 in punitive damages under RCW 48.30.015(2), as well as reasonable attorney fees and expert witness fees under RCW 48.30.015(3). (*Id.* ¶ X.)

In its answer, Lincoln National raised ERISA preemption as an affirmative defense. (Answer (Dkt. # 29) ¶ XII.1-2.) On October 16, 2009, Lincoln National removed the lawsuit to federal court (Dkt. # 1).

### III.   ANALYSIS

**A.   Motion for Summary Judgment**

The Estate now moves for summary judgment that ERISA does not apply on the ground that the Voluntary Policy is exempt from ERISA coverage under the Department of Labor's "safe harbor" regulation, 29 C.F.R. § 2510.3-1(j). This regulation provides that a group insurance plan offered to employees is within the safe harbor regulation and thus exempt from ERISA coverage when:

(1) No contributions are made by an employer or employee organization;

(2) Participation in the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j).  All four provisions must be met before a plan is considered exempt from ERISA.  The Estate contends that all four provisions are met here: TECT made no contributions to the Voluntary Policy; participation in the Voluntary Policy was voluntary; TECT never endorsed, or even recommended, the Voluntary Policy to employees like Mr. Galloway; and there is no indication that TECT profited in any way from Mr. Galloway's Voluntary Policy with Lincoln National.  (*See* Mot. at 4-6; *see also* Reply (Dkt. # 30) at 6-11.)  Relying on the Summary Plan Description ("SPD") for the TECT Employee Benefits Plan ("Plan"), Lincoln National responds that the first provision is not met in this case because TECT contributes to the Plan described in the SPD and the Voluntary Policy is merely one component of the Plan.  (*See* Resp. (Dkt. # 24) at 7.)  Lincoln National also responds that the third provision is not met because TECT endorsed the Voluntary Policy by including it in the SPD and by undertaking

1  certain administrative duties.  (*Id.* at 9-10.)  Thus, only the first and third provisions of

2  the safe harbor are in dispute.

3     1.  Summary Judgment Standard

4        Summary judgment is appropriate "if the pleadings, the discovery and disclosure

5  materials on file, and any affidavits show that there is no genuine issue as to any material

6  fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);

7  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477

8  F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing that

9  there is no material factual dispute and that he or she is entitled to prevail as a matter of

10  law.  *Celotex*, 477 U.S. at 323.  If the moving party meets this burden, the nonmoving

11  party must go beyond the pleadings and identify specific facts which show a genuine

12  issue for trial.  *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229

13  (9th Cir. 2000).

14     2.  ERISA Preemption

15        ERISA broadly preempts state law that relates to "any employee benefit plan" as

16  described in the statute.  29 U.S.C. § 1144(a); *see Pilot Life Ins. Co. v. Dedeaux*, 481 U.S.

17  41, 47-48 (1987).  For an employee benefit plan to come within ERISA's sphere of

18  influence, it must be "established or maintained" by an employer.  *See* 29 U.S.C. §

19  1002(1).  Department of Labor regulations set out a "safe harbor" provision explaining

20  when an employer may be involved with an employee welfare benefit plan without

21  having "established or maintained" it.  *See* 40 Fed. Reg. 34,526 (Aug. 15, 1975); 29

22  C.F.R. § 2510.3-1(j).  It is only when all four of the safe harbor provisions are satisfied

1    that an employer is not considered to have "established or maintained" the program or

2    plan, thereby falling outside ERISA's rubric.  *See Stuart v. UNUM Life Ins. Co. of Am.*,

3    217 F.3d 1145, 1149 (9th Cir. 2000).  Because the claim of ERISA preemption is an

4    affirmative defense, however, the burden is on the defendant to establish that the safe

5    harbor regulation is inapplicable.  *See Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d

6    1118, 1119 n.2 (9th Cir. 1998) (citing *Kanne v. Conn. Gen. Life Ins. Co.*, 867 F.2d 489,

7    492 n.4 (9th Cir. 1988)).  Thus, although the Estate is the moving party, Lincoln National

8    has the burden of showing that one or more of the safe harbor provisions have not been

9    met.

10        3.  Court's Consideration of the Summary Plan Description

11        As an initial matter, the Estate requests that the court not consider the SPD in

12    ruling on its motion for summary judgment.  (Reply at 5.)  In making this request, the

13    Estate argues that Lincoln National should not be allowed to rely on documents that were

14    not previously disclosed and which are not part of the administrative record provided to

15    the Estate in accordance with the discovery plan contained in the Joint Status Report

16    ("JSR") (Dkt # 11).  (*Id.* at 5.)  The Estate relies on Federal Rule of Civil Procedure

17    37(c)(1), which provides: "If a party fails to provide information or identify a witness as

18    required by [Rule 26(a) governing initial disclosures], the party is not allowed to use that

19    information or witness to supply evidence on a motion, at a hearing, or at a trial, unless

20    the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

21    According to the Estate, Lincoln National's late disclosure is not "harmless," as the

22

1    Estate relied exclusively on the administrative record in bringing its motion for summary

2    judgment and the discovery deadline has now passed.  (Reply at 5.)

3        This argument, however, is without merit.  First, Lincoln National disclosed the

4    SPD on May 24, 2010.  (*See* Blackburn Decl.)  The discovery cut-off date was May 25,

5    2010.  Thus, the SPD was timely disclosed.  Moreover, the Estate filed its motion for

6    summary judgment on April 21, 2010, a month before the discovery cut-off date; the

7    Estate thus had ample time to request production of the SPD—or any other evidence

8    pertaining to the issue of ERISA preemption—under Federal Rule of Civil Procedure 34.

9    *See* Fed. R. Civ. P. 34(a)-(b).  Rather, the Estate chose not to conduct discovery on the

10   preemption issue, relying instead on the administrative record.

11       Finally, the Estate first argued that ERISA does not apply in its April 21, 2010

12   motion for summary judgment—after Lincoln National submitted initial disclosures,

13   including the administrative record.  Thus, prior to the Estate's filing of the motion for

14   summary judgment, Lincoln National was not on notice that documents showing that the

15   Voluntary Policy was governed by ERISA were relevant.[2]  Having introduced a new

16

17       [2] The Estate contends that the JSR, filed on February 2, 2010, and an e-mail from Simon
     H. Forgette, attorney for the Estate, to Robert Radcliff, attorney for Lincoln National, sent on
18   February 1, 2010, (Dkt. # 31-2), made it clear to Lincoln National that the Estate was opposing
     the application of ERISA in this case.  (Reply at 3.)  However, the JSR clearly states: "The
19   [c]ourt has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this matter arises under
     the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*
20   ("ERISA")."  (JSR at 1.)  It also states that "[t]his case involves a dispute over life insurance
     benefits under an ERISA plan . . . ."  (*Id.*)  And while the JSR, and the e-mail of February 1,
21   2010, both mention that the Estate disagrees with Lincoln National over the "extent" of ERISA
     preemption (*see* JSR at 2; Forgette Decl. (Dkt. # 31-2) Ex. 1 at 1), the court finds this language
22   insufficient to put Lincoln National on notice that the Estate intended to assert the safe harbor
     provision of ERISA.

theory in its motion for summary judgment, the Estate may not object to Lincoln National

submitting the now-relevant SPD in response to this motion.  Accordingly, the court will

consider the SPD in analyzing the safe harbor exemption.

    4.  <u>Applicability of the Safe Harbor Exemption</u>

      In light of the SPD, Lincoln National has met its burden of showing that the third

provision of the safe harbor regulation is not met because, as plan administrator, TECT

endorsed the Voluntary Policy.  The Ninth Circuit has held that being administrator of a

plan "endorses" it within the meaning of the safe harbor regulation.  In *Kanne*, for

example, the court held that the defendant insurance company met its burden of showing

that the third provision of the safe harbor regulation was not met.  *Kanne*, 867 F.2d at

493.  The court reasoned as follows:

> The plan brochure submitted by [the insurance company] as an exhibit at
> trial describes the plan as an ERISA plan, evidencing the intent of [the
> employer] to create an ERISA plan.  It is clear that, at a minimum, [the
> employer] does not merely advertise the group insurance, but rather, as
> administrator of the plan, 'endorses' it within the meaning of 29 C.F.R. §
> 2510.3-1(j)(3).

*Id.*  The Ninth Circuit has repeatedly cited *Kanne* on this issue.  *See, e.g., Stuart*, 217

F.3d at 1149; *Zavora*, 145 F.3d at 1120; *Crull v. Gem Ins. Co.*, 58 F.3d 1386, 1389 (9th

Cir. 1995).  In *Zavora*, for example, the Ninth Circuit held that an employer, named as

plan administrator under a summary plan description, "endorsed" the plan within the

meaning of the safe harbor regulation even though the employer was "administrator in

name only."  *Zavora*, 145 F.3d at 1120.  The court reasoned that "endorsement may occur

1  even if [the employer] does not operate the plan" because "*Kanne* suggests that a plan

2  administrator necessarily endorses a plan." *Id.*

3      Here, the SPD expressly provides:

4      [TECT] is the 'plan administrator' and has the responsibility and
       discretionary authority for interpreting the terms of the Plan, and for
5      determining eligibility for participation in the insured and self-insured
       programs. The plan administrator will resolve all disputes with respect to
6      the interpretation of the Plan in accordance with the claim and appeal
       procedures for the Plan. If you have any general questions regarding the
7      Plan . . . contact the Human Resources Director of [TECT].[3]

8  (SPD at 44.) Moreover, the SPD defines the Plan to include all the benefits described in

9  the SPD, including the Voluntary Policy. (*See* SPD at 5-6.) For example, the Voluntary

10 Policy is listed in the SPD alongside all the other benefits available to eligible TECT

11 employees. (*See id.*) The SPD also lists the Voluntary Policy in its Life Insurance

12 Programs section. (*See id.* at 23.) Thus, because the SPD names TECT as administrator

13 of the Plan and because the Plan includes the Voluntary Policy, TECT endorsed the

14 Voluntary Policy within the meaning of the safe harbor's third provision.

15     The Estate does not address TECT's status as plan administrator. Instead, the

16 Estate contends that *Kanne* does not govern here because in *Kanne* the plan brochure

17 described the plan as "an ERISA plan," whereas no such language exists in TECT's SPD;

18 and thus, a reasonable employee would conclude that the Voluntary Policy is not

19

20

_____

21  [3] Under the SPD, TECT is the administrator of the Plan; however, as plan administrator,
    TECT grants discretionary authority to Lincoln National to act as plan fiduciary for the
22  Voluntary Policy. (*See* SPD at 34, 44.)

1    included in the portion of the Plan governed by ERISA.  (Reply at 8.)  This argument is

2    unavailing.

3         First, the Plan *is* "an ERISA plan" even if the SPD does not expressly describe it

4    as such.  An ERISA employee welfare benefit plan is a plan, fund, or program

5    "established or maintained by an employer" to provide benefits in the event of illness,

6    disability, or certain other conditions.  *See* 29 U.S.C. § 1002(1)(A).  Here, the SPD states:

7    "[TECT] maintain[s] the TECT Employee Benefits Plan to provide health care and other

8    welfare benefits for our eligible employees."  (SPD at 5.)  The SPD also specifically

9    mentions ERISA: "As a participant in the Plan, you are entitled to certain rights and

10   protections under [ERISA]."  (*Id.* at 40.)  The SPD then lists certain ERISA rights and

11   protections—including steps claimants can take to enforce their ERISA rights.  (*Id.* at 40-

12   42.)  Finally, under the heading "Type of Plan" in the General Information section, the

13   SPD states: "The Employee Benefits Plan is a welfare benefit plan."  (*Id.* at 48.)  Thus,

14   the SPD establishes the Plan as an ERISA plan.

15        Moreover, TECT endorsed the Voluntary Policy within the meaning of the safe

16   harbor regulation because a reasonable employee would conclude that TECT made the

17   Voluntary Policy appear to be part and parcel of the Plan.  In *Johnson v. Watts Regulator*

18   *Co.*, 63 F.3d 1129, 1135 (1st Cir. 1995), the First Circuit held:

19        [A]n employer will be said to have endorsed a program within the purview
          of the Secretary's safe harbor regulation if, in light of all the surrounding
20        facts and circumstances, an objectively reasonable employee would
          conclude on the basis of the employer's actions that the employer had not
21        merely facilitated the program's availability but had exercised control over
          it *or made it appear to be part and parcel of the company's own benefit*
22        *package.*

ORDER- 11

(emphasis added).  As stated above, TECT included the Voluntary Policy in its SPD as "part and parcel" with all of its benefit plans.  (*See* SPD at 5-6, 23.)  The SPD further directs TECT employees to complete and file election forms with TECT's human resources department to participate in the Voluntary Policy.  (*Id.* at 8.)  In addition, TECT human resource managers explain all benefits available under the Plan—including the Voluntary Policy— to new employees.  (Blackburn Decl. at 2.)  And while employees pay the entire cost of coverage for the Voluntary Policy (*see* SPD at 23), in the section entitled "Who Pays the Costs?" the SPD states: "You and the Company share the cost of participating in the *Plan*" (*id.* at 23(emphasis added)).  Thus, based on this evidence, a reasonable employee would conclude that TECT made the Voluntary Policy appear to be part and parcel of the Plan.

TECT, as administrator of the Plan, endorsed the Voluntary Policy within the meaning of the safe harbor regulation.  TECT also endorsed the Voluntary Policy because a reasonable employee would conclude that TECT made the Voluntary Policy appear to be part and parcel of the Plan.  Because Lincoln National has met its burden of showing that the third provision of the safe harbor regulation is not met, it is unnecessary for the court to address the disputed first provision.  The court therefore denies the Estate's motion for summary judgment that ERISA does not apply.

**B.      Motion to Supplement the Administrative Record**

The Estate also moves to supplement the administrative record with the declaration of  Dr. Robert T. Fraser, Ph.D. ("Fraser Declaration") (Dkt. # 17-2)—a

1  "vocational assessment" expert—on the ground that the Fraser Declaration will assist the

2  court in determining whether Lincoln National abused its discretion in denying Mr.

3  Galloway's claim.  (Mot. at 5.)  The Estate also contends that the Fraser Declaration will

4  assist the court in determining the proper standard of review.  (*Id.* at 7-9.)

5      1.  Governing Law

6          In the ERISA context, a district court "sits more as an appellate tribunal than as a

7  trial court," and it "evaluates the reasonableness of an administrative determination in

8  light of the record compiled before the plan fiduciary."  *Denmark v. Liberty Life*

9  *Assurance Co.*, 481 F.3d 16, 21 (1st Cir. 2007) (quoting *Leahy v. Raytheon Co.*, 315 F.3d

10  11, 18 (1st Cir. 2002)).  A district court reviews ERISA benefits denials de novo "unless

11  the benefit plan gives the administrator or fiduciary discretionary authority to determine

12  eligibility for benefits"; if the plan does grant such discretionary authority, courts review

13  the administrator's decision for abuse of discretion.  *Firestone Tire & Rubber Co. v.*

14  *Bruch*, 489 U.S. 101, 115 (1989).  "[I]n general, a district court may review only the

15  administrative record when considering whether the plan administrator abused its

16  discretion."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006).

17  However, "an insurer that acts as both the plan administrator and the funding source for

18  benefits operates under what may be termed a structural conflict of interest," *id.*; and

19  "that conflict [of interest] must be weighed as 'a facto[r] in determining whether there is

20  an abuse of discretion,'" *Snow v. Standard Ins. Co.*, 87 F.3d 327, 330 (9th Cir. 1996)

21  (quoting *Firestone*, 489 U.S. at 115).

22

1      2.  <u>Substantial Procedural Violations</u>

2         Here, the SPD grants Lincoln National discretionary authority.  (*See* SPD at 34,

3  44.)  Therefore, the court finds that the proper standard of review in this case is abuse of

4  discretion.  The Fraser Declaration does not alter the standard of review from abuse of

5  discretion to de novo because it does not present evidence of procedural irregularities so

6  substantial as to alter the standard of review.

7         The Ninth Circuit has held that "[w]hen an administrator engages in wholesale and

8  flagrant violations of the procedural requirements of ERISA . . . we review de novo the

9  administrator's decision to deny benefits."  *Abatie*, 458 F.3d at 971.  Moreover, a plan

10  administrator's decision is entitled to deference only when the administrator exercises

11  discretion that the plan grants as a matter of contract.  *Firestone*, 489 U.S. at 111.  Thus,

12  in general, district courts review de novo a claim for benefits when an administrator fails

13  to exercise discretion.  *Abatie*, 458 F.3d at 972.

14         But here, Lincoln National did exercise discretion.   ERISA claims procedure

15  regulations provide, in relevant part:

16        [T]he   plan   administrator   shall   provide   a   claimant   with   a
         written . . . notification  of  any  adverse  benefit  determination.    The
17        determination shall set forth –

18        (i)   The specific reason or reasons for the adverse determination;

19        (ii)   Reference to the specific plan provisions on which the determination
                is based;
20
         (iii)   A description of any additional material or information necessary for
21               the claimant to perfect the claim and an explanation of why such
                material or information is necessary;

22

ORDER- 14

> (iv)   A description of the plan's review procedures and the time limits applicable to such procedures . . . .

29 C.F.R. § 2560.503-1(g).  Lincoln National followed these procedures in this case. (*See* Admin. Rec. at 78-81, 107-10, 169-71.)  Lincoln National reviewed Mr. Galloway's medical records and autopsy report to determine that Mr. Galloway's condition did not preclude him from working in other, sedentary occupations.  (*Id.* at 79-81, 108-09, 170.)  Lincoln National referenced the Voluntary Policy's definition of "totally disabled" and explained why Mr. Galloway did not fit this definition.  (*Id.* at 78-79, 107-08, 169.)  Lincoln National also described the type of information that could be helpful to the Estate in support of its case.  (*Id.* at 110, 171.)  And, Lincoln National explained the Voluntary Policy's review procedures, and the time limits of those procedures, to the Estate.  (*Id.* at 109, 171.)  Thus, by following ERISA claim procedures, Lincoln National exercised discretion in deciding Mr. Galloway's benefits claim.

While the Estate contends that Lincoln National failed to exercise discretion by failing to conduct a "vocational assessment" of Mr. Galloway's ability to perform sedentary work—relying instead on medical records to determine that Mr. Galloway could perform such work (*see* Mot. at 8-9)—this contention actually goes to whether Lincoln National abused its discretion by conducting an *improper* vocational assessment and does not go to whether Lincoln National *failed* to exercise discretion completely.

Here, the Fraser Declaration does not present evidence of any procedural violations so substantial as to alter the standard of review, and the administrative record

ORDER- 15

1   shows that Lincoln National exercised discretion in making its decision.  Thus, the

2   standard of review remains abuse of discretion.

3       3.  Full development of the administrative record

4           While the Fraser Declaration fails to provide evidence of procedural violations so

5   substantial as to alter the standard of review, the Fraser Declaration does provide

6   evidence that Lincoln National's failure to conduct a proper vocational assessment

7   prevented the full development of the administrative record.  (*See* Fraser Decl. at 2-13.)

8   The Ninth Circuit has recognized that

9           [e]ven when procedural irregularities are smaller, and abuse of discretion
            applies, the [c]ourt may take additional evidence when the irregularities
10          have prevented full development of the administrative record.  In that way,
            the court may, in essence, recreate what the administrative record would
11          have been had the procedure been correct.

12  *Abatie*, 458 F.3d at 973.  In this case, the Fraser Declaration includes evidence that, in

13  determining that Mr. Galloway's condition did not preclude him from performing other

14  available sedentary occupations, Lincoln National failed to properly assess whether Mr.

15  Galloway could actually sit for an eight-hour period.  (Fraser Decl. at 7-8, 10-11.)

16  Lincoln National specifically failed to address Mr. Galloway's self-reported

17  Rehabilitation Survey form (Admin. Rec. at 125-128) in which Mr. Galloway noted

18  problems with sitting for more than an hour, lifting more than 10 pounds, and having re-

19  aggravated an existing back injury.  (*Id.*)  By failing to address relevant information

20  contained in the administrative record, Lincoln National's "vocational assessment" was

21  incomplete and the administrative record was therefore not fully developed.  The court

22  will consider the Fraser Declaration for the purpose of assessing the effect of this failure.

ORDER- 16

1      4.    <u>Conflict of Interest</u>

2           The Fraser Declaration also assists the court in weighing Lincoln National's

3    structural conflict of interest as a factor in its abuse of discretion review.

4           The Ninth Circuit, in *Abatie,* recognized that "weighing a conflict of interest as a

5    factor in abuse of discretion review requires a case-by-case balance" and that "[a]n

6    egregious conflict may weigh more heavily (that is, may cause the court to find an abuse

7    of discretion more readily) than a minor, technical conflict might." *Abatie*, 458 F.3d at

8    968.  For example, "[w]here evidence of inconsistent reasons for denial, failure to

9    adequately investigate or request necessary information, or repeated wrongful denials

10   exists, the conflict will be weighted more heavily and less deference accorded the

11   administrator's decision." *Bartholomew v. UNUM Life Ins. Co.*, 579 F. Supp.2d 1339,

12   1341 (W.D. Wash. 2008) (citing *Saffon v. Wells Fargo & Co. Long Term Disability Plan*,

13   522 F.3d 863 (9th Cir. 2008)).  Moreover, a district court

14           may, in its discretion, consider evidence outside the administrative record
             to decide the nature, extent, and effect on the decision-making process of
15           any conflict of interest; the decision on the merits, though, must rest on the
             administrative record once the conflict (if any) has been established, by
16           extrinsic evidence or otherwise.

17   *Abatie*, 458 F.3d at 970.  Here, the Fraser Declaration assists the court in deciding the

18   nature, extent, and effect of Lincoln National's conflict of interest on its decision-making

19   process.  The Fraser Declaration provides evidence that Lincoln National failed to

20   adequately investigate Mr. Galloway's ability to perform sedentary work and failed to

21   credit Mr. Galloway's statement that he could sit for no more than one hour.  (Fraser

22   Decl. at 2, 6-7.)  The Fraser Declaration also provides expert opinion that Lincoln

ORDER- 17

1   National's "vocational assessment" of Mr. Galloway was "unreasonabl[e]" by

2   employment assessment standards.  (*Id.* at 10-11.)  Thus, because abuse of discretion

3   review—with conflict weighed as a factor—in an ERISA benefits denial case amounts to

4   "a credibility determination about the insurance company's or plan administrator's reason

5   for denying coverage under a particular plan and a particular set of medical and other

6   records," *Abatie*, 458 F.3d at 969, the Fraser Declaration assists the court in deciding the

7   level of skepticism with which to view Lincoln National's decision.  The court will

8   therefore consider the Fraser Declaration for this purpose.

9                           **IV.    CONCLUSION**

10          For the foregoing reasons, the court DENIES the Estate's motion for summary

11   judgment (Dkt. # 19), and GRANTS the Estate's motion to supplement the administrative

12   record (Dkt. 17) for the limited purposes discussed above.

13          Dated this 2nd day of July, 2010.

14

15

16          _____

17          JAMES L. ROBART
            United States District Judge

18

19

20

21

22

ORDER- 18